UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| JOHN K. HARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:15-CV-594-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICER KEITH HILLMAN, et al., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

Following remand from the Sixth Circuit, on December 10 and 17, 2021, this Court held *Remmer* hearings to determine if racial bias impacted the jury's verdict. *See Harden v. Hillman*, 993 F.3d 465, 485 (6th Cir. 2021). Pursuant to the Court's Order, [R. 237], Plaintiff John Harden and Defendant Keith Hillman both filed post-hearing briefs. [R. 255; R. 256].[1] Shortly thereafter, Harden filed a Motion for Hearing, [R. 247]. Hillman responded and filed a Motion to Strike, [R. 249; R. 250]. Harden replied, [R. 252]. These matters are now ripe for consideration. For the reasons below, the Court finds that racial bias prejudicially affected the jury deliberations. Accordingly, Harden is entitled to a new trial. The Court further holds that Harden's Motion for Hearing is denied, and Hillman's Motion to Strike is denied as moot.

## I. BACKGROUND

This action arises from an altercation between Harden and Hillman inside a Thorntons convenience store in Louisville, Kentucky. [R. 1; R. 243]. On the evening of August 1, 2014, Harden drank a couple of beers after work and fell asleep. *Harden*, 993 F.3d at 471. Around 1:20 a.m.,

[1] Both parties initially filed their post-hearing briefs under seal, ostensibly to protect the personally identifiable information ("PII") of the jurors. The Court entered an Order, [R. 254], requiring the parties to re-file their briefs in the open record redacting any PII and referring to each juror by initials only. The parties complied, [R. 255; R. 256].

Harden woke up and headed toward a local Thorntons store to purchase more beer. *Id.* At that time, Hillman, an off-duty police officer for the City of Heritage Creek, was providing security for the Thorntons store. *Id.* When Harden attempted to purchase beer, the store clerk told Harden she would not serve him because it seemed that he had already had too much to drink, and she could smell alcohol on his breath. *Id.* Harden exclaimed, "I don't believe this." *Id*. In response, Hillman shouted, "[D]idn't she say she wasn't selling you any beer." *Id.* Hillman then told Harden to leave the store and not return. *Id.* Harden left the store, intending to head to another store to buy beer. *Id.* However, because Kentucky law prohibits the sale of beer after 2:00 a.m., Harden realized he would be unable to make it to another store in time to purchase the alcohol. *Id.* As a result, Harden decided to forgo purchasing more beer and, instead, returned to Thorntons to purchase a bag of chips. *Id.* Upon Harden's return, Hillman said, "I thought I told you not to come back in here." *Id.* Hillman then ran over to Harden, pinned him against the counter, and told him that, if he did not leave the store immediately, Hillman would arrest him. *Id.* Harden replied, "[w]ell, take me to jail." *Id.* Hillman then allegedly slammed Harden onto the floor and handcuffed him. *Id*. Hillman called for transport to the police station. *Id.* "However, after Harden told him that 'I need to go to the doctor. I'm hurt pretty bad. You've messed up my back,' Hillman called for emergency medical services, which transported Harden to the University of Louisville Hospital." *Id*. At the hospital, Hillman issued Harden a citation for disorderly conduct, resisting arrest, and public intoxication. *Id.* Harden was released that night and the charges against him were eventually dismissed after Hillman failed to appear for court. *Id.*

On July 8, 2015, Harden filed suit against Hillman (in his official and individual capacities), the City of Heritage Creek, and Thorntons, Inc. [R. 1]. Judge Joseph McKinley eventually dismissed all Harden's claims aside from his excessive force claim against Hillman in his individual capacity. [R. 103; R. 171]; *see also Harden*, 993 F.3d at 472. On July 17, 2019, after a three-day trial, the jury

found in favor of Hillman. [R. 169]. On August 15, 2019, Harden filed a Motion for New Trial based on the district court's refusal to order the Marshals Service to serve his subpoenas and defense counsel's alleged improper arguments during trial. [R. 181]; *Harden*, 993 F.3d at 472. The district court denied the Motion. [R. 199].

On November 1, 2019, Harden filed his second Motion for New Trial. [R. 202]. With permission of the district court, [R. 198], Harden's counsel, Aubrey Williams, contacted a juror whose stepfather, a practicing lawyer, had reached out to him about potential concerns with the jury deliberations. Harden submitted an affidavit[2] from Juror T.H., an African American, alongside his second Motion for New Trial. [R. 201; R. 202]. As recounted by the Sixth Circuit, T.H.'s affidavit stated:

> [H]er "service on the jury was a very painful, humiliating and embarrassing experience, so much so that it has caused me not to ever again want to serve on another jury. I feel this way because of the blatant racial stereotyping, bias, and prejudice shown by my fellow jurors toward Mr. Harden and his legal team." She explained that her "fellow jurors, all of whom were white, spoke freely in [her] presence because they thought [she] was Latin[a] because of [her] complexion and the pronunciation of [her] name." Specifically, she averred that her fellow jurors "discounted and totally disregarded Mr. Harden's testimony in particular and his case in general because they believed he was a crack addict, and that his intent was to start trouble with Officer Hillman so he could sue the police department and get some money," and that "[t]hey discredited his testimony and attributed the calmness he showed in describing the events by claiming that he was taking dope or drinking during breaks in the trial." T.H. further alleged that the jurors "took verbatim what Mr. Hillman's [white] attorney said but described [Harden's African American lawyer] and his team as the 'Cosby Show.'" T.H. sought to remind her fellow jurors that their job was to decide whether Hillman had used excessive force; however, the jurors "kept saying he just wants money; he's a crack head; he's an alcoholic; look at his wife, she's nodding off; she looks like she's on heroin." When T.H. explained that she was a nurse and that Harden "wouldn't be able to stay in the courtroom all these hours and stay focused if he was on drugs," members of the jury replied, "you don't know what he's doing on breaks," which T.H. understood to indicate a belief that Harden was "taking a swig during breaks to stay calm." T.H. concluded: "It is my very firm and absolute belief that Mr. Harden did not get a fair trial because of his race and racial stereotyping. Furthermore, there is absolutely no doubt in my mind that the race

[2] Juror T.H.'s affidavit, [R. 201–1], is attached to this Order as Exhibit A.

> of the lawyers was a significant factor. The jurors hung on [to Hillman's counsel's] every word but gave no consideration at all to [Harden's counsel's] points.

*Harden*, 993 F.3d at 472–73. Without holding a hearing to investigate Juror T.H.'s allegations, Judge McKinley denied Harden's second Motion for New Trial. [R. 206].

Harden appealed, [R. 207], arguing that the district court improperly (1) granted summary judgment on his Fourth Amendment claim; (2) denied his first Motion for New Trial; and (3) denied his second Motion for New Trial. *Harden*, 993 F.3d at 470. On April 6, 2021, the Sixth Circuit issued its opinion, affirming as to the first two claims and vacating the district court's denial of Harden's second Motion for New Trial. *Id.* at 471. As to Harden's second Motion for New Trial, the court found that Federal Rule of Evidence 606(b) barred inquiry into two of the Motion's allegations: (1) that a juror provided the jury with an incorrect legal standard and (2) that a juror lied during *voir dire*. *Id*. at 478.

As to the third allegation, that the jury's verdict was motivated by racial bias, the Sixth Circuit reversed the trial court's denial of Harden's second Motion for New Trial, holding that, pursuant to *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), Federal Rule of Evidence 606(b) did not bar inquiry into the issue. *Harden*, 993 F.3d at 478–82. Rule 606(b) prohibits jurors from testifying about jury deliberations, but "contains exceptions for when: '(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; and (C) a mistake was made in entering the verdict on the verdict form.'" *Id.* at 477 (quoting Fed. R. Evid. 606(b)(2)). In *Pena-Rodriguez*, the Supreme Court carved out another Rule 606(b) exception. The *Pena-Rodriguez* court held that when there is a "showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberation and resulting verdict," "the Sixth Amendment requires that the

no-impeachment rule give way[.]" 137 S. Ct. at 869. *Id.* In *Harden*, the Sixth Circuit, for the first time, expanded *Pena-Rodriguez*'s holding to civil cases. 993 F.3d at 478–81 The Sixth Circuit held that, "[a]lthough the Sixth Amendment is unavailable, as it was in *Pena-Rodriguez*, to fulfill the Constitution's demand that racial discrimination be eliminated from the civil courtroom, the Fourteenth Amendment's guarantee of 'equal protection of the laws' provides a sufficient basis to extend *Pena-Rodriguez* to civil cases." *Id*. at 481.

Based on *Pena-Rodriguez* and the unique importance of ridding the judicial system of racial prejudice, the *Harden* court held that the district court abused its discretion by not inquiring into the "statements exhibiting overt racial bias" contained in Juror T.H.'s affidavit. *Id.* at 481–85. In determining that the statements exhibited overt racial bias, the Sixth Circuit analyzed historical efforts to associate African Americans with drugs, like crack cocaine, which carry over into pervasive racial stereotyping in the present day. *Id.* at 482–83. Further, the Sixth Circuit rejected Hillman's argument that "none of the jurors could have been motivated by racial bias because he is also African American," reasoning that "there is nothing inconsistent with a juror harboring and expressing racial stereotypes about African Americans and drugs as to Harden but not applying those same stereotypes to a police officer [like Hillman]." *Id*. at 485, n.9.

*Pena-Rodriguez* did not address the procedures a trial court must follow when considering evidence that jurors relied on racial bias to reach a verdict. *Id.* at 485. Nonetheless, the Sixth Circuit reasoned that, because courts conduct hearings pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), "in the context of the Rule 606(b) exceptions to the no-impeachment rule," a *Remmer* hearing is the appropriate procedure to investigate allegations of racial bias during deliberations. *Harden*, 993 F.3d at 485. Accordingly, the Sixth Circuit remanded the case with instructions for the district court to

hold a *Remmer* hearing "to allow Harden a meaningful 'opportunity to establish actual bias.'" *Id*. The Sixth Circuit directed that all interested parties must be allowed to participate and attorneys for each side should have the opportunity to question the jurors to determine if racial bias affected the deliberations. *Id.* "And if the hearing reveals that racial bias or stereotypes 'prejudicially affected jury deliberations,' Harden would be entitled to a new trial." *Id.* (citation omitted).

**II. The *Remmer* Hearings**

On remand, the case was transferred to the undersigned. Pursuant to the Sixth Circuit's instructions, the Court held two days of *Remmer* hearings, wherein both parties and the Court questioned each available juror[3] at great length. In its Order Regarding Attendance of Jurors, the Court informed the jurors that they were required to return for a hearing, without informing them of the purpose of the hearing, and prohibited them from researching the case or deleting any electronic records from the beginning of trial to three days post trial (in the event the Court found such records relevant for inspection). [R. 226; R. 227]. On December 10, 2021, the parties and the Court questioned Juror T.H. via Zoom, as she is a traveling nurse and was unable to attend the hearing in person. [R. 232; R. 236; R. 238]. During her two-plus hours of testimony, Juror T.H. convincingly reaffirmed the troubling contents of her affidavit. [R. 236; R. 238, 13:15–22]; *see infra* Section IV(a)(i). She also explained that, per her training as a nurse to document incidents in detail, she wrote down the events of the jury deliberations shortly after the trial ended. [R. 238, 16:12–16]. She further testified that it was her idea to contact Harden's counsel about her concerns. *Id.* at 16:1–8.

On December 17, 2021, the Court and the parties reconvened and questioned the seven remaining available jurors. [R. 239, pp. 9–253]. Importantly, Juror J.R. confirmed the essence

[3] Juror M.G. was medically incapacitated and unable to testify. [R. 237, n.1].

of T.H.'s affidavit related to speculation concerning Harden and his significant other's drug use, as well as jokes involving how "rough" they looked and comparisons between Harden's trial team and *The Cosby Show*. Most of the remaining jurors denied or could not recall hearing comments related to drug use by Harden and his significant other. A couple jurors recalled comments involving *The Cosby Show* and Harden's counsel's "theatrical" presentation style. A summary of each juror's testimony is as follows.

**a. Juror E.A**

Juror E.A. stated that she did not recall any remarks from her fellow jurors about Harden looking like a crack addict or using drugs. *Id.* at 12:19–13:25, 17:17–18:8. She denied hearing comments that Harden was drinking during trial. *Id.* at 13:8–12. She also denied that any jurors remarked that Harden's significant other was on heroin or was a drug addict. *Id.* at 13:16–25. She did not recall any comments from any jurors that indicated racial bias. *Id.* at 13:13–15, 14:1–4. When asked whether any jurors compared Harden's trial counsel to *The Cosby Show*, E.A. stated that "[t]here was reference that there was some drama to it . . . It was not a negative, anything that I'm recalling. It was just more of a humorous type of a thing that they were very—oh, I don't know, I'm going back to that word 'dramatic' about things." *Id.* at 14:5–20; *see also id.* at 20:19–25. She believed the statements were not based on race, but just commenting on "somebody's style." *Id.* at 14:24–125:1. She testified that the jury rendered its verdict based on the evidence presented, and that any comments did not affect the deliberations. *Id*. at 15:5–16:5; *see also id.* at 44:11–15.

**b. Juror J.R.**

During his initial testimony, J.R. denied hearing any comments about Harden being on drugs, being a crack addict, or drinking alcohol during the trial. *Id.* at 58:14–59:22. As the

Court continued to question him, he explained that statements could have been said quietly at the other end of the table, but he did not hear them. *Id.* at 59:4–60:21. He could not remember any of the jurors speculating as to Harden's partner's drug use. *Id.* at 60:22–61:8, 77:6–12. Juror J.R. frequently caveated his testimony, demonstrated angst on the witness stand, and left the Court with the clear impression that he wanted to say more but was holding back.

He later acknowledged that the statement about *The Cosby Show* may have been made. *Id.* at 64:3–9. Asked again about whether jurors made jokes about Harden using drugs or alcohol, J.R. responded,

> [M]aybe because, I mean—okay. When we were sitting around, I mean, there was some— I think there was some jokes being made, just—you know, not necessarily about Mr. Harden or anything that has to do with court, just, you know, jokes that are being made. You know, it may have went in one ear and out the other.

*Id.* at 66:11–17. When asked specifically if jokes were made about drug use, J.R. replied, "I don't think so . . . there was no racial jokes made—I know that—that I would consider to be racial jokes . . . You know, maybe somebody made a snide comment about something and—just for a chuckle. I can't remember what it was." *Id.* at 67:6–13. When asked about comments concerning Harden's partner's drug use, he answered, "I don't remember any. I mean, there may have been a comment or two, but I could not tell you what those comments were word for word . . . Yeah, because I was uninterested in them." *Id.* at 68:4–9. When asked again specifically whether anyone commented that Harden's partner was on heroin, J.R. said "I mean, somebody may have said that during the trial, but I just—I don't—I don't remember it." *Id.* at 77:10–13. When asked again about comments related to *The Cosby Show*, he testified, "when you say 'Cosby,' it seems like—you know, maybe because you said it a few times that it's kind of—you know, but I just—I don't remember anybody making any snide or racial

remarks or anything like that." *Id*. at 69:23–70:1. He further explained that "if anything was said, it was during deliberation, and it was very brief" and "if somebody said that, I mean, there was a chuckle and everybody moved on." *Id.* at 74:6–9, 86:11–14. J.R. testified that he did recall someone at the other end of the table commenting that Harden "just wants the money." *Id.* at 98:7–8. J.R. recalled a "little girl" sitting next to him who was a nurse (clearly referring to Juror T.H.) and "had some really valid points," and that he was focused on "what she was saying versus some of the other comments that were made down the table[.]" *Id.* at 70:2–9. He stated that none of the statements affected his verdict. *Id*. at 101:21. As with all jurors, the Court encouraged Juror J.R. to contact the Clerk's office should he later think of additional, relevant information.

After leaving the courtroom, Juror J.R. did just that. Within a couple hours, he contacted the jury coordinator and returned to give additional testimony, which occurred between the testimonies of Jurors M.T. and A.K. *Id.* at 216–36. J.R. testified that,

> The name Cosby did come into play. There was a couple chuckles. I do remember that now. I don't think that the statement was long and lengthy and—you know, about Cosby, but I—it seems like I do remember that, and there was a couple chuckles. It wasn't my main focus. So I really didn't pay no attention to it . . . I think we had just pretty much got into the room. We hadn't been in there that long, I don't think . . . And then it just seems like I heard somebody say something about Cosby, and then there was a couple of chuckles . . . Like I said, I don't think it was, like, a long, lengthy statement about Cosby. I think it was just, like, a quick reference to Cosby or something.

*Id.* at 216:22–217:25–218:5, 218:7–11. When asked who made the Cosby comment, J.R. described the juror wearing a baseball cap the day of the hearing (Juror C.F.), who J.R. identified as the "personality" of the group. *Id.* at 218:21–219:20. J.R. thought C.F. made the statement about Cosby near the beginning of the deliberations to "lighten the mood or

something." *Id.* at 220:4–7. He said that more than one person chuckled in response. *Id.* at 220:3–4.

Juror J.R. further testified that, sometime in the middle of the deliberations, female jurors at the other end of the table from him made "some kind of a reference to drugs." *Id.* at 217:4–7. Asked again about comments related to drug use by Harden, as outlined in Juror T.H.'s affidavit, J.R. added, "There were some statements made. I couldn't tell you word for word what they were, but I can say that they may have been along the lines of what you just told me to a certain extent." *Id.* at 221:12–15. He did not "necessarily remember them saying—or anybody saying crack," but added there was also a reference to how "rough" someone looked, which was connected to drug use. *Id.* at 222:16–18; *see also id.* at 225:16–20. He testified that the comments about drugs and looking "rough" were "at some point" directed at both Harden and his significant other. *Id.* at 223:2; *see also id*. at 222:3–4. He described that "one person made the comment [about drugs], more than one person laughed, but there was only a couple to a few chuckles that I remember." *Id.* at 224:19–21. J.R. testified that he heard those comments "loud and clear," even though he sat at the other end of the table. *Id.* at 225:5–13. He believed that one of the women who made the comments was the woman who testified before his initial testimony—Juror E.A. *Id.* at 217:4–21. He testified that he did not sense a connection between the jokes and issues of race. *Id.* at 226:1–7. When asked about whether he thought the comments carried over into the actual deliberations, he said "No . . . it did not carry over for me." *Id.* at 228:11–13. Interestingly, J.R. explained that he did not enjoy serving as a juror, and that he "always remember[s] the details, but [he] kind of wanted to put [his jury service] behind [him], you know, because [he] had a lot of different thoughts afterwards." *Id.* at 220:16–22.

**c. Juror M.K.H.**

According to Juror M.K.H., she and T.H. were "the only two [jurors] thinking possibly there was excessive force." *Id.* at 119:13–16. M.K.H. denied or could not remember any speculation about whether Harden was a drug addict or whether he used drugs or alcohol to get through the trial. *Id.* at 111:7–23. She further stated that she remembered Harden's partner falling asleep and jurors discussing during deliberations "Did anybody else hear that? and "Did that really happen?" *Id*. at 112:6–9. When asked again about whether any jurors made comments about Harden being on drugs, M.K.H. testified: "It's hard to say because when you mention it, I think, 'Oh, maybe they did say that,' but it—it's hard to know for sure. And I feel like it would be reasonable for us to wonder, like, what—you know, who these people are[.]" *Id.* at 135:23–136:6. When asked if comments about drugs or alcohol could have been made in reference to Harden or his significant other, M.K.H. stated, "There could have been comments like that. I don't remember them. I do remember that we talked about her nodding off." *Id.* at 133:22–133:11. As to the statements about drug use, M.K.H. testified

> Similar comments were likely made. I don't remember—I know that they did mention her nodding off—so that's credible—and I remember them saying that he wanted money. That's credible. I don't—I don't know anything about alcohol and drugs personally. So I don't—I don't recall that. That doesn't stand out to me. I don't remember that, but it could have been said.

*Id.* at 135:11–22; *see also id.* at 136:2–11. Although she did not recall any specific statements comparing Harden's counsel to *The Cosby Show*, she remarked that Harden's counsel's style was "theatrical," and that he "caught [the jurors'] attention by being pretty loud and just moving [his] hands." *Id.* at 112:25–113:16, 118:7–11. She later told Mr. Williams, "I mean, I know who Bill Cosby is, and I feel like you sort of resemble Bill Cosby. So I feel like maybe there was, like, a mention of you resembling him . . ." *Id.* at 131:25–132:13. M.K.H. did not

feel that her fellow jurors were judging the case based on race, especially since Hillman was also African American. *Id.* at 121:12–15. She stated that she reached her decision because she felt Harden did not prove excessive force, and that the case could have been prepared better and presented more smoothly on behalf of Harden. *Id.* at 129:5–120:19.

**d. Juror A.L.**

Juror A.L. identified herself as the foreperson of the jury. *Id.* at 147:14–15. She testified that she did not remember hearing any speculation about Harden's drug and alcohol use. *Id.* at 146:12–147:4. She did not recall any discussion about Harden's significant other falling asleep during trial or her possible drug use. *Id.* at 149:4–10. However, she later testified that comments about her falling asleep "sound[ed] vaguely familiar." *Id.* at 173:12–15; *see also id.* at 175:2–5. She did not remember any comments comparing Harden's counsel to *The Cosby Show* but described Mr. Williams as "very dramatic." *Id.* at 148:7–10, 176:3–7. She claimed there was one juror, T.H., who was making speculative arguments, perhaps taking race into account, while the rest of the jurors focused on the evidence presented. *Id.* at 150:5–13, 152:25–153:24.

**e. Juror C.F.**

Juror C.F. recalled no speculation as to Harden's drug or alcohol use. *Id.* at 171:8–173:7, 179:14–19. He recalled that Harden's partner had fallen asleep during the trial, but did not remember any mention of drugs or heroin during the deliberations. *Id.* at 173:12–174:7, 179:20–180:3. Juror C.F. did not remember if he or any of his fellow jurors referred to Harden's counsel as *The Cosby Show*. *Id.* at 175:19–176:17. He testified that the jury reached its verdict based on the lack of evidence presented at trial, in accordance with the jury instructions, and that he did not focus on the credibility of the parties. *Id.* at 191:10–193:20.

**f. Juror M.T.**

Juror M.T. did not recall any speculation about Harden or his significant other's drug or alcohol use. *Id.* at 198:23–200:5. He did recall some discussion about Harden's significant other falling asleep during the trial and that maybe the judge had asked her to move out of the courtroom. *Id.* at 200:9–25. He recalled the jurors discussing that Harden's counsel was "animated," but did not recall any reference to Bill Cosby or *The Cosby Show*. *Id.* at 202:3–203:5. He stated that he "got a feeling that someone might have been just rushing to get through jury duty a little," and that there was a lack of discussion by some jurors during the deliberations, but he did not feel it was related to race. *Id.* at 203:23–24, 204:6–205:15. He explained that "it was more of a feeling just during deliberations, that they were just kind of—there was no discussion. It was just like it was a 'I don't think that he's—deserves anything.'" *Id.* at 204:8–11; *see also id.* at 205:2–15.

**g. Juror A.K.**

Juror A.K. did not recall any jokes or discussion about Harden's drug use, aside from discussing the evidence about alcohol and drugs introduced at trial.[4] *Id.* at 236:7–237:19. She did not recall Harden's significant other or any statements about her. *Id*. at 237:20–238:4, 240:3–6. She did not recall any comments about *The Cosby Show* or Bill Cosby. *Id.* at 240:16–23. Juror A.K. identified herself as a formerly addicted individual who is now a counselor, but

[4] As explained by the Sixth Circuit, "[I]n 1987, Harden was discharged from the military after he failed a drug test for marijuana. However, the existence of a single 32-year-old failed drug test for marijuana does not demonstrate that the jury's comments were not racially motivated—especially considering the jury's comments about Harden's romantic partner and legal team, as well as T.H.'s understanding of the comments." *Harden*, 933 F.3d at 483, n.7.

she did not recall stating anything about Harden being able to stay calm while on drugs during trial, as T.H. alleged in her affidavit. *Id.* at 250:9–16. In fact, she stated that she would not say that someone would be calm while taking a stimulant like crack, and it would be "pretty visible" if someone was under the influence of something like that. *Id.* at 251:4–10. When asked whether anyone commented that Harden's significant other was falling asleep because she was on drugs, A.K. testified that, given her history as a therapist, "[I]t wouldn't be impossible . . . I tend to notice things like that . . . So it's something that I— if it had happened, I probably would have noticed that or thought it." *Id*. at 239:17–25.

Post hearing and pursuant to the Court's Order, [R. 237], the parties filed simultaneous briefs under seal on March 7, 2022, [R. 241; R. 243]. The parties later refiled redacted versions of their briefs, [R. 255; R. 256], in accordance with the Court's Order at [R. 254]. Predictably, the parties disagree as to whether the evidence elicited at the *Remmer* hearings demonstrated that the jury deliberations were prejudicially affected by racial bias. *See* [R. 255; R. 256]. Harden subsequently filed a Motion for Hearing on Juror Misconduct, in which he sought a hearing to examine (1) whether Juror C.F. and/or Hillman's counsel lied to the Court in saying Juror C.F. disclosed that his grandfather was a police officer during *voir dire*, and (2) defense counsel's characterization of Harden's counsel's presentation in his post-hearing brief. *See* [R. 247]. In his Motion, Harden also included an explanation of a case on jury bias, unrelated to his requests for a hearing. *Id.* at 3. Hillman responded, arguing that the Sixth Circuit's opinion on appeal rendered a hearing moot and that the argument as to defense counsel's misconduct is unrelated to the *Remmer* proceedings before this Court. [R. 249]. Harden replied, [R. 252]. Hillman also filed a Motion to Strike Harden's discussion of case

law, contending it was Harden's attempt "to add to his Post-*Remmer* Hearing legal arguments without seeking leave of the Court[.]" [R. 250, p. 1].

## III. STANDARD OF REVIEW

As explained above, in this case the Sixth Circuit held *Pena-Rodriguez* applies to civil cases and remanded the case "with instructions to conduct a *Remmer* hearing to investigate juror bias and grant a new trial if juror bias is found." *Harden*, 993 F.3d at 485–86. In *Remmer*, the Supreme Court held that a colorable claim of jury bias is presumptively prejudicial, and a trial court faced with such a claim in the context of the Rule 606(b) exceptions to the no-impeachment rule must conduct a hearing where all interested parties may participate. 347 U.S. at 227; *see also United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999). Subsequently, the Court clarified in *Smith v. Phillips* that "the remedy for allegations of juror partiality is a hearing in which the *defendant* [movant] has the opportunity to prove actual bias." 455 U.S. 209, 215 (1982) (emphasis added). Uniquely among the circuits, the Sixth Circuit interpreted *Smith* as shifting "the burden of showing bias at *Remmer* hearings to defendants and stripp[ing] defendants of the presumption of prejudice." *Cunningham v. Shoop*, 23 F.4th 636, 649 (6th Cir. 2022) (citing *United States v. Zelinka*, 862 F.2d 92, 95–96 (6th Cir. 1988)); *see also Davis*, 177 F.3d at 557 (explaining that, in the Sixth Circuit, "the defendant bears the burden of proving actual juror bias[.]"); *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021) (citing *Zelinka*, 862 F.2d at 95) ("We are the only circuit that places on the defendant the burden of proving bias at the *Remmer* hearing rather than requiring the Government to show 'that an unauthorized contact was harmless.'"). In other words,

> (1) when a defendant alleges that [juror bias] has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such contact; (3) the defendant bears the

burden of proving actual juror bias;[5] and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.

*United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998) (quoting *Zelinka*, 862 F.3d at 95–96*); see also Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (internal quotations and citations omitted) ("Actual bias is bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."); *Holder v. Palmer*, 588 F.3d 328, 339–40 (6th Cir. 2009) (same). "When evaluating whether juror bias is established, a district court must 'objectively weigh all of the facts and circumstances of the case' and 'reasonably explore [ ] the issues presented.'" *Lanier*, 988 F.3d at 296 (internal citations omitted). Although most relevant Sixth Circuit case law comes from the criminal context, and refers to the defendant bearing the burden, in the civil context, the movant bears the burden. "[I]f the [*Remmer*] hearing reveals that racial bias or stereotypes 'prejudicially affected jury deliberations,' Harden would be entitled to a new trial." *Harden*, 993 F.3d at 485.

[5] Upon a thorough examination of relevant Sixth Circuit case law, it appears that the terms "actual bias" and "actual prejudice" are used interchangeably in describing the showing a movant must make at a *Remmer* hearing to entitle him to a new trial. *See Herndon*, 156 F.3d at 637 ("Because the risk of prejudice is so great when a jury is tainted with extraneous information, we believe that Herndon should have an opportunity to establish whether prejudice existed. Accordingly, we vacate Herndon's conviction and sentence and remand the case for a *Remmer* hearing in which Herndon will have an opportunity to prove actual bias.") (internal citation omitted); *see also Smith v. Nagy*, 962 F.3d 192, 199, 202 (6th Cir. 2020) (explaining that "[t]he trial court 'must hold a *Remmer* hearing 'to afford the defendant an opportunity to establish actual bias" and later stating that "a defendant must show actual prejudice to be entitled to a new trial[.]"); *United States v. Rugiero*, 804 F. Supp. 925, 929 (stating that "[t]he defendant has the burden of proving that any unauthorized communication with jurors resulted in actual juror bias," and then explaining that the district court can rely on juror assurances of continued impartiality in deciding "whether a defendant has satisfied the burden of proving actual prejudice."); *United States v. Eakes*, No. 5:18-CR-00023-TBR, 2019 U.S. Dist. LEXIS 147397, at *12 (W.D. Ky. Aug. 29, 2019) (stating that "[t]he defendant bears the [burden] of proving actual juror bias" and later holding that "Eakes has failed to show *bias or prejudice* resulting from any possible juror misconduct[.]") (emphasis added); *Sheppard v. Bagley*, 657 F.3d 338, 248–49 (6th Cir. 2011) (Batchelder, J., concurring) ("*Remmer* was abrogated in part by the Supreme Court in *Smith v. Phillips*, which held that the defendant has the burden to show that there has been actual prejudice. 455 U.S. 209, 215–17 (1982) (stating that '[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias[.])'"); *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001) ("To maintain a claim that a biased juror prejudiced him, however, [Petitioner] must show that the juror was actually biased against him."). In essence, the question is whether the movant can establish that an improper consideration "resulted in actual juror partiality." *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984). "[I]f the [*Remmer*] hearing reveals that racial bias or stereotypes 'prejudicially affected jury deliberations,' Harden would be entitled to a new trial." *Harden*, 993 F.3d at 485.

The Sixth Circuit has suggested that "deference should be accorded a district court's findings made after a properly conducted hearing." *Pennell*, 737 F.2d at 532; *see also United States v. Herndon,* 230 F.3d 1360 (Table) (affirming the trial court's finding, after conducting a *Remmer* hearing, that no actual prejudice resulted from alleged juror bias, and stating: "This court defers to the fact-finder's determinations regarding witness credibility."); *United States v. Griffith*, 756 F.2d 1244, 1252 (6th Cir. 1985) ("[O]n appeal the judge's decision whether to grant a mistrial because of the juror's use of or exposure to extraneous matter will be reviewed only for abuse of discretion.") (citations omitted).

## IV. ANALYSIS

### a. Statements During Jury Deliberations

Juror T.H.'s affidavit, [R. 201], which alleges that the jury based its verdict on racial animus rather than the evidence presented, is deeply troubling. As described above, Juror T.H. stated that her fellow jurors (1) speculated that Harden was a "crack addict" and was using drugs or alcohol to stay calm during trial, (2) speculated that Harden's partner fell asleep during trial because she was on heroin, and (3) referred to Harden's African American legal team as *The Cosby Show*. [R. 201–1, pp. 2–3, ¶¶ 3–5]. In her *Remmer* hearing testimony, Juror T.H. convincingly affirmed her sworn affidavit and further explained the statements in her affidavit. She testified that a few jurors made comments like "'Oh, this is gonna be easy.'" [R. 238, p. 25:16–18]. Although she tried to steer the jury toward the evidence presented, T.H. testified that other jurors speculated that Harden "was on crack;" that he looked "homeless;" that he "was looking for an easy way out, a lawsuit;" that Harden's "wife looked like she was currently on heroin;" and that Harden was an alcoholic who was likely drinking during breaks to stay calm. *Id.* at 19:25–20:1, 26:1–18, 28:23–29:4. Other jurors agreed with the sentiments. *Id.* at 27:20. As to *The Cosby Show* comparison, she stated "They described Mr. Williams [Harden's

counsel] and his team as *The Cosby Show*. 'He reminds me of Bill Cosby. This looks like *The Cosby Show*'" and others laughed. *Id.* at 24:22–25:6.

The Court took seriously its obligation to investigate the allegations and root out potential racial bias. The Court and the parties questioned the jurors at length, spending over nine hours in the courtroom and producing over three hundred pages of transcripts. *See* [R. 238; R. 239]. For the reasons outlined below, the Court is convinced that the race-based statements described in T.H.'s affidavit and her *Remmer* hearing testimony were made during jury deliberations.

**i. Credibility Determinations**

In analyzing whether one or more jurors made the statements alleged in T.H.'s affidavit, the Court assessed the credibility of the jurors' testimonies. *See Wheaton*, 426 F. Supp. 2d 666, 671 (N.D. Ohio 2006) ("It is well within the Court's discretion to believe or disbelieve individual juror assurances of impartiality based on its observations."). The Court observed each juror's testimony, their body language, tone, and demeanor. Based on the entire record, the Court found Jurors T.H. and J.R. highly credible, and has no doubt that the comments outlined in T.H.'s affidavit were made during deliberations.

The Court found T.H. sincere and highly credible for a multitude of reasons. Although the *Remmer* hearings occurred over two years after the trial, Juror T.H. remained visibly shaken by her fellow jurors' behavior during deliberations. In her *Remmer* hearing testimony, Juror T.H. emotionally and painstakingly reaffirmed the contents of her affidavit. *See* [R. 238, 13:15–22]. Her testimony was detailed, measured, earnest, compelling, and closely tracked her affidavit, notwithstanding the passage of a year since she had last seen her statement. *Id.* at 19:12–16.

T.H. testified that she left the courthouse in tears after her jury service, feeling "just devastated at the bias." *Id.* at 14:1. She immediately called her mother to express her frustration and

disappointment, stating "I never want to serve on another jury again in my life." *Id.* at 14:8–12. When her stepdad, an attorney, became aware of her concerns with the deliberation process, he advised her to write down everything that occurred during the deliberations and possibly contact the news or take other action. *Id.* at 14:21–15:5. Based on her stepdad's advice, and in keeping with her training as a nurse to take notes while events are fresh, Juror T.H. testified that she wrote down the details of the jury deliberations shortly after they occurred. *Id.*; *see also id.* at 16:12–16. T.H. considered the gravity of bringing these issues to the court's attention prior to contacting Harden's counsel:

> I prayed on it. [My stepdad] asked me to pray on it for a couple of days because, you know, it was a big thing that I would be doing, that it's not something that was just as simple as saying, "Hey, I don't like anything." This would actually be an entire process that would follow behind it. And to pray on it and think about it and consider if this is—these are really the steps that—you know, if it was something that I really wanted to do.

*Id.* at 15:6–13. She continued, "I had people that asked me a number of times if this was something that I was certain about, just because of the implications that would happen afterwards, but it was my idea." *Id.* at 17:1–4.

At the *Remmer* hearing, Hillman's counsel reminded T.H. that she participated in the unanimous verdict and failed to raise any concerns during the trial concerning the deliberations. *Id.* at 52:5–10. T.H. explained, "I had a lot of shame behind that. That's the reason I left the courthouse crying . . . I did begrudgingly." *Id.* at 55:5–10. She went on, "And I am ashamed of myself, but the only thing that I could do to rectify that instead of having a hung jury was to speak up." *Id.* at 53:14–16. T.H. further explained that she felt compelled to come forward based on the oath she took as a nurse "to advocate for what's right and for people." *Id.* at 15:14–18. She stated that she did not bring the issues to the court's attention during deliberations because "I didn't know that I could stop and say, 'Hey, Judge, I think that they're being racist.'" *Id.* at 54:24–25. The Court found Juror T.H.'s testimony believable and credible. This Court frequently has the opportunity to observe and assess the

credibility of witnesses during hearings and trials. Without question, T.H. was one of the most credible and compelling witnesses the Court has ever observed.

The Court also found Juror J.R. credible. As mentioned above, the Court had the distinct impression during his initial testimony that J.R. remembered additional information but was uncomfortable disclosing it. Within hours of his initial testimony, J.R. contacted the jury coordinator to return and provide additional testimony. In addition to corroborating T.H.'s core allegations, J.R. provided information concerning which jurors made the comments and where they were seated during deliberations. He also generally recalled when the comments were made: the comparison to *The Cosby Show* occurred early in the deliberations, while the comments about drug use occurred in the middle of the deliberations. *Id.* at 228:2–25. Taken together, Juror J.R.'s hesitancy to disclose the comments, his visible discomfort during his testimony, his difficult decision to return to provide supplemental testimony, and his recall of additional details surrounding the statements underscore his credibility.

In contrast, the Court finds the other jurors' testimony generally less persuasive and credible. Most jurors did not recall the statements, but none of the jurors convincingly testified that such statements were not made. It is certainly possible that some jurors did not hear the statements. It is likewise possible that the jurors' inability to recall the comments could be a function of the passage of time, as the *Remmer* hearing occurred two years after the trial. [R. 239, pp. 31:14–20, 114:12–115:22, 146:12–147:4, 171:8–17, 237:1–238:4, 240:7–15]; *see also Lanier*, 988 F.3d at 298 ("[T]he accuracy of the information yielded at *Remmer* hearings declines over time."); *see also Cunningham*, 23 F.4th at 662 (same). It could also be a function of the difficulty in acknowledging (or even being aware) that racially biased statements were made. *See infra* Section IV(b)(ii). Or it could be a mix of all those factors. Regardless, the Court finds the other jurors' testimony less convincing.

**ii. Speculation About Drug Use**

In her *Remmer* testimony, T.H. confirmed the allegations in her affidavit related to racial stereotyping "that didn't have anything to do with the actual facts," testifying that jurors made the following comments about Harden and his significant other: "He just wants money. He went in there to start a fight so that he could get arrested. Look at him. He looks homeless. He looks like he's on crack. Is he an alcoholic?" and "The wife is nodding off. She looks like she's on heroin." *Id.* at 19:24–20:11; *see also id.* at 26:1–11. When T.H. pushed back that if Harden was an alcoholic, he would likely demonstrate signs of physical withdrawal or be fidgety, some jurors speculated about Harden consuming alcohol during the trial: "Well, how do you know that he's not going out on his break and drinking? Like, we don't know what he's doing." *Id*. at 26:10–17; *see also id.* at 28:24–29:4. In general, T.H. described the comments regarding Harden as "just very stereotypical of a poor black man in the ghetto that used drugs and was looking for a come up. That just—just, basically, was the gist of almost everything that was said about him." *Id.* at 36:21–24.

Juror J.R. confirmed the essence of T.H.'s affidavit. Consistent with Juror T.H.'s testimony, Juror J.R. recalled that some of the female jurors at the other end of the table made speculative comments about Harden and his significant other's drug use. [R. 239, 221:12–23]. He could not recall the exact comments, and he didn't "necessarily remember . . . anybody saying crack," but testified in response to the Court reading excerpts from the affidavit that the statements "may have been along the lines of what you [the Court] just told me to a certain extent." *Id.* at 221:12–15, 222:13–19. Further, he testified that the women commented that both Harden and his partner looked "a little rough," while referencing drugs. *Id.* at 222:17–223:4. He believed that the comments occurred somewhere in the middle of the deliberations. *Id.* at 222:3–9. Juror J.R. further stated that he thinks "one person made the comment" and "more than one person laughed[.]" *Id.* at 224:19–23. He recalled Juror E.A. being

involved in that discussion. *Id.* at 217:4–20. Juror J.R. heard the comments "loud and clear" from the opposite end of the juror table, indicating that the comments were very likely heard by other jurors. *Id.* at 225:5–18. In sum, Juror J.R.'s testimony supports Juror T.H.'s allegation that one or more jurors speculated about Harden and his significant other's drug use.

Although Juror A.K. did not recall Harden's significant other falling asleep during trial or speculation about drug use, she admitted she would have jumped to the same conclusion because of her history of addiction and her experience as a therapist at a rehab facility: "If it had happened, I probably would've noticed that or thought it." *Id.* at 239:17–240:2. Further, when asked whether any members of the jury speculated about drugs, alcohol, and crack cocaine, Juror M.K.H. said

> It's hard to say because when you mention it, I think, "Oh, maybe they did say that," but it—it's hard to know for sure. And I feel like it would be reasonable for us to wonder, like, what—you know, who these people are, just like when it was over I wondered about them.

*Id.* at 136:2–6. The remaining jurors did not recall, or denied, speculation about drug use. *Id*. at 12:19–25, 13:16–25, 171:8–17, 201:10–18. However, based on the high credibility of Juror T.H.'s testimony, the credible and corroborating testimony of Juror J.R., and other statements made by Jurors A.K. and M.K.H., the Court is convinced such statements were made during deliberations.

#### iii. Comparisons to *The Cosby Show*

The Court also finds that one or more of the jurors compared Harden's African American counsel and trial team to *The Cosby Show* and/or Bill Cosby. At the *Remmer* hearing, Juror T.H. testified "They described Mr. Williams and his team as *The Cosby Show*. 'He reminds me of Bill Cosby. This looks like The Cosby Show.'" *Id.* at 24:22–24. When asked about the reaction of other jurors to these comments, T.H. advised, "They laughed"; "[T]here was some laughter and some agreement." *Id.* at 25:2–4, 47:24–25.

Once again, Juror J.R. confirmed Juror T.H.'s testimony on this point. Importantly, when Juror J.R. returned to provide additional testimony, he specifically recalled that Juror C.F. made a statement referencing Bill Cosby shortly after the jury retired for deliberations. *Id.* at 216:22–219:20. He could not recall whether the comment was directed at Harden or Harden's counsel but testified that there were "a couple of chuckles" in response to the comment. *Id.* at 218:3–20. Other jurors stopped short of recalling references to *The Cosby Show*, but distinctly recalled discussion about Mr. Williams' presentation style, referring to him as "theatrical" or "dramatic." For example. Juror E.A. stated "[t]here was reference that there was some drama to it." *Id.* at 14:5–9. And Juror M.T. stated that the jurors discussed how Mr. Williams "was very animated when he talked." *Id.* at 202:15–21. Independently, comments about counsel's presentation style are hardly concerning. However, given the clear and credible testimony from Jurors T.H. and J.R. that jurors jokingly compared Mr. Williams and plaintiff's trial team to *The Cosby Show*, the statements related to "drama" and "theatrics" lend further support that such comparisons were made. Based on the high credibility of Juror T.H.'s testimony, corroborated by Juror J.R., and consistent with other juror statements concerning Mr. Williams' presentation style, the Court finds that one or more jurors jokingly compared Harden's counsel and trial team to *The Cosby Show*—a comedy show featuring an African American cast.

**b. Bias and Prejudicial Effect on Deliberations**

Finding that one or more of the jurors made the statements alleged in Juror T.H.'s affidavit, the Court turns to whether the statements demonstrate racial bias, and if so, whether actual racial bias prejudicially affected the jury deliberations.

**i. Bias Exhibited by the Statements**

The Court finds that the statements made during deliberations clearly invoked racial stereotypes. *United States v. Smith*, a case from the United States District Court for the District of

Minnesota, is instructive on this point. In that case, the court analyzed whether comments invoking racial stereotypes, but not directly referring to the defendant's race, indicated that racial bias impacted jury deliberations. Crim. No. 12-183 (SRN), 2018 WL 1924454, at *4–6 (D. Minn. Apr. 24, 2018). Four years after a jury convicted Smith for being a felon in possession of a firearm and illegally possessing a short-barreled shotgun, the court received an email from a juror ("D.B.") stating that he had recently become aware of the Supreme Court's decision in *Pena-Rodriguez* and that "[a] racial remark was made during our deliberations." *Id*. at 1, 4. D.B. asserted that, during deliberations, another juror ("W.B.") stated something to the effect of "You know he's just a banger from the hood, so he's got to be guilty." *Id*. at 4.

Applying *Pena-Rodriguez*, the *Smith* court rejected the Government's argument that the statement did not "show that racial animus was a significant motivating factor in the juror's vote to convict" because it did not directly reference Smith's race. *Id.* at 9–12. The court explained:

> [H]ere, when considered without context, the term "banger"—slang for "gangbanger"—does not explicitly invoke race. *See* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/banger (last visited April 23, 2018). As noted, no evidence at trial identified Smith as a gang member. However, the juror combined "banger" with the phrase "from the hood," with "hood" referring to an inner-city neighborhood. *See id*., www.merriam-webster.com/dictionary/hood (last visited April 23, 2018). Trial testimony made clear that the "hood" in question was North Minneapolis. (*See, e.g.,* Trial Tr. at 60–62, 78, 143, 146, 307, 334.) The racial demography of North Minneapolis is majority African American. *See* Twin Cities Daily Planet, https://www.tcdailyplanet.net/ethnic-makeup-changed-north-minneapolis/ (describing data compiled by the U.S. Census Bureau and City of Minneapolis over a 30–year period (1980–2010) (last visited April 23, 2018)). The juror used a racially biased stereotype to find that Smith—a black man from a majority-black neighborhood of Minneapolis—was a gang member, should be disbelieved, and was guilty. The statement's reasoning employed the racist stereotype that black men from the inner city are gang members. The racially-charged language ("banger from the hood") was coupled with views on Smith's guilt, creating a relationship between the two. Given this context, the Court finds the statement clearly indicates racial bias.

*Id.* at 10.

Here, like in *Smith*, the statements at issue—involving speculation that Harden was "homeless," "on crack," and looking for a "come up;" assumptions that his significant other was on heroin simply because she nodded off during trial; and comparisons between Harden's African American trial counsel and *The Cosby Show*—did not directly reference race. However, the Sixth Circuit determined that the statements in T.H.'s affidavit exhibited overt racial bias sufficient to trigger the *Pena-Rodriguez* exception to the no-impeachment rule. *Harden*, 993 at 481–85. In reaching its conclusion, the Sixth Circuit thoroughly examined the "pervasive and harmful racial stereotypes regarding African Americans and drugs, and specifically, crack cocaine." *Id.* at 482. The court explained historical efforts to associate African Americans with drugs, stating:

> In the mid-1980s, there was a strategic effort to build public and legislative support for the War on Drugs. *See* MICHELLE ALEXANDER, THE NEW JIM CROW 5 (2010). As a result, "the media was saturated with images of black 'crack whores,' 'crack dealers,' and 'crack babies,'— images that seemed to confirm the worst negative racial stereotypes about impoverished inner-city residents." *Id.*; *see also* David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 STAN. L. REV. 1283, 1293 (1995) (explaining that "[w]hites strongly associated crack with the same minority group they linked with heroin—inner city blacks."). "The media bonanza inspired by the ... campaign solidified in the public imagination the image of the black drug criminal." *Id.* at 105; *see also* Jelani Jefferson Exum, *From Warfare to Welfare: Reconceptualizing Drug Sentencing During the Opioid Crisis*, 67 U. KAN. L. REV. 941, 947 (2019). For example, although African Americans constitute only 15 percent of drug users, in a study that asked participants to close their eyes and "envision a drug user, ... [n]inety-five percent of respondents pictured a black drug user." *Id.* at 106; *see also id.* at 127 (discussing a study showing that the Seattle Police Department's drug enforcement efforts reflected "a racialized conception of the drug problem" that focused "heavily on crack"); Lis Wiehl, *"Sounding Black" in the Courtroom: Court-Sanctioned Racial Stereotyping*, 18 HARV. BLACKLETTER L.J. 185, 186, 202–03 (2002) (stating that crack cocaine is "a drug predominately associated with African Americans.").

*Id*. at 483. With this necessary historical context in mind, the Sixth Circuit reasoned that, "[a]ccording to T.H.'s affidavit, members of the jury engaged in exactly this racial stereotype." *Id.* The Sixth Circuit acknowledged that the statements in this case may not be as egregious as the statement at issue in *Pena-Rodriguez*—that the defendant was guilty of sexual assault

"because he's Mexican and Mexican men take whatever they want"— but reasoned that "when the juror's statement indicated that racial bias played a role in the juror's vote, nothing in *Pena-Rodriguez* limits the definition of 'overt racial bias' to situations as extreme as the one presented by the facts in that case." *Id.* at 484.

The Sixth Circuit's reasoning is consistent with *Smith*; comments need not directly reference race to exhibit racial bias. *See* 2018 WL 1924454, at *10. This Court, also having the benefit of conducting a lengthy *Remmer* hearing and the ability to weigh the credibility of the jurors, reaches the same conclusion. While the statements may not have directly referenced race, they plainly demonstrate that jurors invoked historically pervasive racial stereotypes in baselessly discrediting Harden as a homeless drug addict looking for money. *See id*. This conclusion is bolstered by baseless speculation about Harden's partner using heroin and comparisons between Harden's African American trial counsel and Bill Cosby, an African American comedian. Plainly, certain jurors viewed Harden's partner and counsel, both African American, through the same distorted, biased lens that they viewed Harden and invoked the same pernicious racial stereotyping. In context and in combination, the statements clearly invoked racial stereotypes.

**ii. Prejudicial Effect on Deliberations**

The Court will now examine whether actual bias prejudicially affected deliberations. As the Sixth Circuit recently stated, "the standard for obtaining a new trial is distinct from the standard for obtaining a *Remmer* hearing: a [movant] must show actual prejudice to be entitled to a new trial, whereas the [movant] only has to establish some likelihood of prejudice to be entitled to a *Remmer* hearing." *Smith v. Nagy*, 962 F.3d 192, 202 (6th Cir. 2020).

Relevant case law supports a finding that the statements demonstrated actual bias and had a prejudicial effect on the deliberations in this case. In *United States v. Heller*, the Eleventh Circuit held that a trial court abused its discretion by refusing to declare a mistrial upon learning that members of the jury made offensive jokes and ethnic slurs. 785 F.2d 1524, 1527–28 (11th Cir. 1986). One day after jury deliberations began, the foreperson of the jury sent the trial judge a note that stated, among other things, that "During the course of this trial, there were comments in the jury room about various testimony. Also, some ethnic slurs were made." *Id.* at 1525. The trial judge then ordered the jury to stop deliberating and questioned each juror individually. *Id.* During the questioning, a juror named Shatten testified that jurors made anti-Semitic "jokes" throughout the trial:

> The trial had barely started or maybe it was before the trial had started, this was supposed to be a huge joke, said, "Hey, somebody asked me what kind of a case you are on." (The juror) said, "Well, the fellow we are trying is a Jew. I say, 'Let's hang him.'"

*Id.* at 1525–26. Shatten further testified as to other anti-Semitic "jokes," which received "gales of laughter." *Id.* at 1526. One of the jurors, Nolan, admitted to using an anti-Semitic slur but testified that he was joking. *Id.* Despite the hearing confirming that these "numerous racial and religious slurs" were made, the trial judge permitted the jurors to continue deliberations because each juror affirmed that they could decide the case based on the evidence without bias or prejudice. *Id.* at 1526–27. On appeal, the government argued that "the anti-Semitic comments made within the jury room were done so purely in a spirit of jest and had no bearing on the jury's deliberations." *Id.* at 1527. The Eleventh Circuit rejected this argument, stating:

> A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires.
>
> . . .

> [A]nti-Semitic "humor" is by its very nature an expression of prejudice on the part of the maker. Indeed, in a society in which anti-Semitism is condemned, those harboring such thoughts often attempt to mask them by cloaking them in a "teasing" garb. A wolf in sheep's clothing is, despite clever disguise, still a wolf. Those who made the anti-Semitic "jokes" at trial and those who reacted to them with "gales of laughter" displayed the sort of bigotry that clearly denied the defendant Heller the fair and impartial jury that the Constitution mandates. *It is inconceivable that by merely denying that they would allow their earlier prejudiced comments to influence their verdict deliberations, the jurors could have thus expunged themselves of the pernicious taint of anti-Semitism.*

*Id.* at 1527–28 (emphasis added). Accordingly, the Eleventh Circuit reversed Heller's conviction and remanded the case for retrial. *Id.* at 1528.

In *Smith*, discussed above, the District of Minnesota analyzed whether a criminal defendant was entitled to a new trial based on racially charged statements by jurors during deliberations. 2018 WL 1924454, at *4–6; *see also supra* Section IV(b)(i). In that case, Juror D.B. testified that one of the jurors remarked "You know he's just a banger from the hood, so he's got to be guilty." *Id*. at 4. D.B. stated that no jurors confronted this statement, and that the statement caused D.B. to reconsider Smith's credibility in light of his race and where he lived. *Id.* The court emphasized that the statement "directly ties a race-based stereotype to W.B.'s conclusion of guilt through the use of the conjunctive 'and.'" *Id.* at 10. The court held that "the no-impeachment rule must give way" and considered Smith's motion for a new trial based on the juror testimony of racial bias. *Id*. at 13. In determining that Smith was entitled to a new trial, the court emphasized:

> [T]he remark was unrelated to any evidence admitted at trial . . . was received by the jury, with no evidence showing that any juror challenged it . . . the remark was made in the final half hour of a five-hour deliberation period, and was made before a verdict was reached . . . the jurors' affidavits and the evidentiary hearing testimony credibly show that the 'banger' remark influenced D.B.'s vote to convict Smith . . . [and] the case turned on the jury's assessment of the credibility of the witnesses. And sadly, even the safeguards for a fair trial—voir dire examination for impartiality and possible biases, the jurors' oath to be fair and impartial, and the Court's instructions regarding the same—were insufficient.

*Id.* at 14–15.

Finally, in *United States v. Robinson*, 872 F.3d 760, the Sixth Circuit analyzed whether a jury foreperson's racist remarks violated the defendants' right to an impartial jury. *Id.* at 768. Two African American jurors, A.R. and M.S., told an investigator that they had been holdouts on the jury and that their refusal to agree with the other ten jurors led to a confrontation with the jury foreperson on the last day of deliberations. *Id.* The jury foreperson—a white woman—allegedly told A.R. and M.S. that she "[found] it strange that the colored women are the only two that can't see" that the defendants were guilty and accused them of intentionally trying to hang the jury. *Id*. She eventually apologized for her remarks but added that she still felt that the two jurors were protecting the defendants because they felt they "owed something" to their "black brothers." *Id.* Jurors A.R. and M.S. eventually voted to convict the defendants. *Id.* The defendants filed a motion for a new trial, which the trial court denied without holding an evidentiary hearing. *Id.* at 769.

On appeal, the Sixth Circuit held that, while the statements were reprehensible, they did not warrant a new trial or hearing. *Id.* at 768. The *Robinson* court first noted that, unlike in *Pena-Rodriguez*, in which a juror approached defense counsel after the verdict, defense counsel initiated contact with the jurors without leave of the court in violation of court rules and a specific admonishment from the bench not to contact jurors. *Id.* at 770. Second, the Sixth Circuit reasoned that, although the statements plainly indicated racial bias or hostility, they did not indicate that the foreperson voted to convict the defendants on the basis of race. *Id*. Specifically, the court stated, "none of the foreperson's remarks here come close to the *Pena-Rodriguez* juror's level of stereotyping or animus, and the foreperson's remarks were not directed against [the defendants] in the same way that the *Pena-Rodriguez* juror's remarks were directed against the defendant in that case." *Id.* at 771. Lastly, the Sixth Circuit also rejected defendants' argument that the foreperson's statements affected

A.R. and M.S.'s votes, because the two jurors reported that they stood by their votes to convict based on the evidence presented. *Id.*

The Court finds these cases instructive. Although the statements at issue in *Heller* were even more egregious than those in the present case, its reasoning applies with equal force. Like in *Heller*, one or more jurors made "jokes," unrelated to any evidence at trial, applying racist stereotypes not only to Harden, but also to his significant other and his trial team. 785 F.2d at 1527. These racist jokes were "an expression of prejudice" guised as humor and went unconfronted. *See id*. As explained by the Eleventh Circuit, "[a] wolf in sheep's clothing is, despite clever disguise, still a wolf." *Id.* Further, the scope and timing of the various comments magnify their pernicious effect. Indeed, the stereotypes were not reserved for Harden alone, but likewise were leveled against his African American significant other and counsel. From the very beginning of deliberations, jurors began making "jokes" comparing Harden's counsel to *The Cosby Show*, and racially charged comments continued into the heart of the deliberations. [R. 239, 217:25–218:5, 222:3–9]. As in *Heller*, this Court likewise finds that the jurors who made and laughed at racially biased remarks could not have easily "expunged themselves of the pernicious taint" of racial bias to render a verdict based solely on the evidence presented. 785 F.2d at 1527. While many of the jurors insisted that they rendered their verdict based on the evidence presented—and the Court does not doubt that the jurors analyzed at least some of the evidence—the racial stereotypes discussed during deliberations undoubtedly affected how those jurors *viewed* the evidence presented. *See id.* In other words,

> A racially biased juror sits with blurred vision and impaired sensibilities and is incapable of fairly making the myriad decisions that each juror is called upon to make in the course of a trial. To put it simply, he cannot judge because he has prejudged.

*Turner v. Murray*, 476 U.S. 28, 43 (1986) (Brennan, J., concurring in part). Consequently, "[t]hose who made the [racist] 'jokes' . . . and those who reacted to them with "gales of laughter" displayed

the sort of bigotry that clearly denied [Harden] the fair and impartial jury that the Constitution mandates." *Heller*, 785 F.2d at 1527.

Testimony produced at the *Remmer* hearings supports that at least some of the jurors may have prejudged the case. *See Turner*, 476 U.S. at 43. For example, Juror M.T. explained that he had a feeling during deliberations "that they were just kind of—there was no discussion. It was just like it was a 'I don't think that he's—deserves anything.'" [R. 239, 204:8–11]. Additionally, Juror M.K.H testified that "the majority of everybody had kind of their mind made up that what we said happened—however we—the outcome was, that's what everybody kind of thought happened." *Id.* at 114:2–5. These statements corroborate Juror T.H.'s testimony:

> I just remember when we first started deliberations, they were like, "Oh, this is gonna be easy." There were a few. There were a handful of jurors that were pretty quiet that were—kind of wanted to talk and deliberate about this, because they weren't so sure, but some of them were like, "This is so clear cut, let's just say that, you know— you know, we're not giving him anything and let's just go."

[R. 238, 25:16–23].

Further, though the Eighth Circuit does not apply the "actual bias" standard utilized by the Sixth Circuit, the factors utilized by the *Smith* court are helpful in analyzing the prejudicial effect of racially biased statements during deliberations. *See Smith*, 2018 WL 1924454, at *14–15. In *Smith*, the court pinpointed several indications that the jury verdict was impacted by racial bias, summarized as follows: the biased statements (1) were made during deliberations and before a verdict was reached; (2) were unrelated to evidence presented at trial; (3) were "received by the jury, with no evidence showing that any juror challenged it;" (4) tied the outcome in the case to racial stereotypes; (5) were made in close proximity to the verdict; (6) were made in a case that involved little physical evidence and largely turned on the credibility of the witnesses; and (7) impacted another juror, who testified that he rendered his decision based on racial bias. *Smith*, 2018 WL 1924454, at *14–15.

This case implicates several of the prejudice factors identified in *Smith*. First, the statements were made during deliberations and before a verdict was reached. Indeed, the statements began at the very outset of jury deliberations and continued, unchallenged, during the middle of deliberations. *See* [R. 239, 218:1–5, 228:21–229:1]. Second, like the remarks at issue in *Smith*, the statements here—*The Cosby Show* reference, as well as speculation of crack cocaine and/or heroin use and Harden being homeless—were unrelated to the evidence produced at trial. *See* [R. 238, p. 21:3–8 ("There were just a number of judgmental, opinionated remarks that were being made that didn't have anything to do with the actual facts of the case[.]")]. Third, no juror exposed or blunted the effect of the racially charged statements. *Id.; see also Commonwealth v. McCowen*, 458 Mass. 461, 498 (Mass. 2010) (finding that racially biased comments did not prejudicially affect the verdict because "the black female juror's appropriate response to the statement served the beneficial purpose of exposing and 'blunting the effect' of the racial stereotype, and of warning the jury of the risk of racial stereotypes infecting their deliberations."). Not only did the statements about drug use go unconfronted, T.H. testified that "[s]ome jurors were in agreement" and J.R. testified that some jurors laughed. [R. 238, 27:20]; [R. 239, 224:19–21]. Further, both T.H. and J.R. testified that jurors laughed in response to comparisons between Harden's African American trial team and *The Cosby Show*. [R. 238, 47:23–25]; [R. 239, 218:3–5, 219:21–220:7]. Specifically, Juror T.H. testified that, when one of the jurors joked about *The Cosby Show,* "[t]here were some at the end that were just very quiet. No one gave any response, but there was some laughter and some agreements." [R. 238, 47:23–25]. She further testified that no one vocally took offense at the speculation about Harden and his significant other's drug use. *Id.* at 48:8–15. Fourth, in a civil case such as this, a statement that Harden is "homeless," a crack addict, and that his intent was to start trouble with Officer Hillman so he could sue the police department and get some money" connects racial stereotypes (African Americans and drug addiction)

with the ultimate outcome in the case (Harden should not prevail because he brought a frivolous suit to get money).

Fifth, while it is unclear exactly how close in time the speculation about drug use occurred to the verdict, it is concerning that the comments invoking racial stereotypes began from the outset and continued at least to the middle of the deliberations. Sixth, in this case, the jurors' credibility determinations as to Harden and Hillman were especially important as they were the only witnesses who testified at trial. *See* [R. 174; R. 175; R. 178; R. 185; R. 186; R. 187; R. 195; R. 211; R. 212; R. 213]; *see also* [R. 255, p. 2]. Further, it appears there was no physical evidence presented of the events at the Thorntons store. [R. 190]. Therefore, the jurors' determinations as to the degree of force used and whether it was justified largely turned on the credibility of the parties. T.H. testified that the jurors failed to consider evidence bearing on Hillman's credibility but invented reasons to discount Harden's credibility:

> [T]hey wanted to speak on the character of Mr. Harden, of his past, and they kept saying of his drug use or alcoholism or the character of his wife. And then it was presented, well, what about the mistakes of—you know, we can't—if we base it on character, we base it on facts, because, you know, if we're looking at character, look at Officer Hillman . . . [W]hen it came to Mr. Harden, they just—like I said, they were ad-libbing and even adding things to his character, just stereotypes into his character as—you know, and I just feel like Officer Hillman was covered under the badge of—you know, it was like he was—he was cloaked versus Mr. Harden was, you know, just—just any stereotype they could put on h[im] or his legal team.

[R. 238, 29:9–30:22]. And seventh, although the *Smith* court found significant that a juror affirmatively testified that racial bias impacted his own verdict, the Court does not believe that such an admission is necessary to find actual bias. *Id.* at 14–15. Outright admission of racial bias, like Juror D.B.'s admission in *Smith*, is rare. That is, requiring a movant to supply a juror's admission that he based his verdict on racial bias would be a near impossible standard.

The Sixth Circuit's analysis in *Robinson* lends further supports to the Court's conclusion. Like in *Pena-Rodriguez*, in which a juror came forward independently to report racist statements during deliberations, and unlike in *Robinson*, in which the movant's counsel violated court rules to contact jurors, Juror T.H. came forward *of her own volition*, after careful consideration, to report troubling behavior in the jury room. *See Robinson*, 872 F.3d at 770–71; *see also* [R. 238, 16:1–8]. Her decision to independently report the comments made during deliberations adds credence to her allegations. Importantly, this case is further distinguishable from *Robinson* because the jurors remarks were targeted *at Harden* and indeed spread to everyone in the courtroom associated with him. *See Robinson*, 872 F.3d at 771. Jurors baselessly speculated about Harden's drug and alcohol use and his purposes for filing the suit, invoking racial stereotypes to assume that Harden was a "homeless" crack addict who just wanted money. [R. 238, 19:24–20:5]. The equally disturbing assumption about Harden's significant other being on heroin and the comparison between Harden's African American counsel to *The Cosby Show* bolster the conclusion that jurors applied racial stereotypes to Harden, viewing him as "a poor black man in the ghetto that used drugs and was looking for a come up." [R. 238, 36:21–24]. Finally, this case is distinguishable from *Robinson* because, unlike the two African American jurors who stood by their votes to convict based on the evidence presented, Juror T.H. testified that she was pressured into voting with the majority and felt uncomfortable with the decision.[6] *See Robinson*, 872 F.3d at 771; [R. 238, 52:8–15, 61:18–24]. This case is distinguishable from *Robinson*, and the Sixth Circuit's reasoning in that case supports a finding of prejudice here.

[6] In Hillman's Post-*Remmer* Hearing Brief, he cites *United States v. Brooks*, 987 F.3d 593 (6th Cir. 2021), for the proposition that pressure on a juror to reach a unanimous decision is simply a natural consequence of jury deliberations. [R. 255, p. 23]. However, *Brooks* is plainly distinguishable from the case at bar. The juror in *Brooks* merely alleged that "immediately in deliberations the other jurors sided with the police even though they all agreed that the[re] was enough lack of evidence to cause a reasonable doubt" and that she "was told by the [jury] members that [she] was not using common sense and was berated every time [she] brought up the lack of evidence." *Brooks*, 987 F.3d at 598. The *Brooks* court found that the juror's statement did not rise to the level of "overt racial bias" sufficient to fit within the *Pena-Rodriguez* exception. *Id.* at 605. In reaching its holding, the *Brooks* court noted two significant problems with the juror's

The credibility determinations detailed above, *supra* Section IV(a)(i), further support a finding that bias prejudiced the jury deliberations. For the many reasons explained, the Court found Juror T.H. highly credible. *See id.* In her *Remmer* hearing testimony, the Court asked Juror T.H. if she believed that the comments "affected the deliberations or the verdict." *Id.* at 31:2–4. She replied,

> Absolutely, I do. I absolutely do. The people that were actually interested in taking the information into you know, the evidence and kind of going through it and—to come up with an actual verdict or decision, they became so swayed by the comments. It was, you know, kind of like peer pressure. And then it became more of what are his intentions on filing his suit versus did this actually happen?

*Id.* at 31:5–12; *see also id.* at 32:1–3. She further testified that when comments about crack and heroin were made, "[s]ome jurors were in agreement." *Id*. at 27:15–20. As mentioned above, when Juror T.H. was asked about how the jurors reacted to the *Cosby Show* reference, she stated that "[t]here were some at the end that were just very quiet. No one gave any response, but there was some laughter and some agreements." *Id.* at 47:17–25. T.H. described her efforts to re-direct the jurors toward the evidence presented:

> I even utilized the white board that was in the room to try to create a timeline and present the—and have the evidence and just what was presented, any discrepancies on both sides that may have been presented, since they wanted—you know, like, what was actually presented, not what was assumed or what—you know, you feel like this is what this person probably is and they weren't interested in—in going through that. They just continued down the rabbit hole of wanting their narrative of Mr. Harden.

---

allegations: "For one thing, the juror's email did not even mention race, let alone suggest that other jurors made race-based remarks . . . For another thing, the juror's email indicates that the other jurors were critical of the juror (and her purported failure to rely on common sense), not of *Brooks*." *Id.* at 604. Here, Juror T.H. plainly alleges that jurors made statements invoking racial stereotypes against Harden and those around him, and those allegations were corroborated at the *Remmer* hearing. *See Harden*, 933 F.3d at 473. Further, the Sixth Circuit already held that the statements in T.H.'s affidavit were not mere "offhand comments," but rather, "were egregious and unmistakable in their reliance on racial bias and show that racial stereotypes about African Americans and drugs were a significant motivating factor in the jury's verdict." *Id.* at 485 (citation and internal quotation marks omitted). Hillman's reliance on *Brooks* is misplaced: *Brooks* merely holds that juror pressure alone, without statements expressing racial animus, does not satisfy the *Pena-Rodriguez* standard. *See* 987 F.3d at 604–05.

*Id.* at 40:7–15. When asked whether the jurors focused on the issue of whether Hillman exerted excessive force on Harden, T.H. responded, "That was not the focus of discussion in the jury room." *Id.* at 48:18–21; *see also id.* at 50:4–13. Finally, when asked by defense counsel as to why she joined in the verdict in favor of Hillman, Juror T.H. testified

> I felt defeated. It was hard. The reason why we deliberated for so many hours is because I kept trying—it was—I solely kept trying to redirect that jury. I was—I was at the forefront of a lot of microaggressions, racial comments that weren't actually made but they were very much insinuated. It was hurtful. It was hard, and I was not strong enough of a person to stand there in front of what is supposed to be my peers, the people that—I pay taxes, but that I live with, that I vote with, the people that are part of my community, part of my state and listen to some of the things they said and be the sole person of color in there. I was not prepared to be strong enough to be that person, and that's why I left that courthouse hurt. And I am ashamed of myself, but the only thing that I could do to rectify that instead of having a hung jury was to speak up.

*Id.* at 53:2–16.

Although the other jurors stated that they did not feel that racial bias impacted the deliberations, the Court is not persuaded. As Justice O'Connor explained, "Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Phillips*, 455 U.S. at 221–22 (O'Connor, J., concurring); *see also McCowen*, 458 Mass. at 503 (Ireland, J., concurring) ("Because of unconscious racism, it is the subtle clues that help give a judge insight into a juror's true feelings."). In *Pena-Rodriguez,* the Supreme Court explained that

> The stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case, as would have been required in *Warger*. It is quite another to call her a bigot.

137 S. Ct. at 869. Juror J.R.'s testimony illustrates this difficulty. The Court observed his clear discomfort and reluctance answering questions about whether he or his fellow jurors invoked

racial stereotypes during deliberations. He ultimately returned to the courtroom, requesting to testify further, and admitted that the statements were made by other jurors. His reluctance in revealing racially charged statements made by other jurors (not even by himself) underscores how difficult it is for a juror to self-report racially-biased statements by other jurors (much less by himself) and why the Court takes little comfort in the other jurors' denials that such statements were made. *See Hughes*, 258 F.3d at 459 ("Bias can be revealed by a juror's express admission of [bias], but more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence.").

The Court finds granting a new trial in this case upholds the ultimate aims of ensuring fairness and equality in the judicial system. As eloquently stated by the Supreme Court in *Pena-Rodriguez*,

> The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted in egregious cases like this one despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement the lessons of history. The Court now seeks to strengthen the broader principle that society can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.

137 S. Ct. at 871. "The judiciary, as an institution given a constitutional mandate to ensure equality and fairness in the affairs of our country when called on to act in litigated cases, must remain ever vigilant in its responsibility." *Heller*, 785 F.2d at 1527. Finding that jurors in this case applied overt racial stereotypes to Harden and those around him, and that those statements affected the outcome of the case, the Court holds Harden is entitled to a new trial before an impartial jury.

**c. Motion for Hearing and Motion to Strike**

Put simply, Harden's Motion for Hearing, [R. 247], discusses issues unrelated to those currently before the Court. First, he asks the Court to investigate Juror C.F.'s alleged failure to

disclose during *voir dire* that his grandfather was a police officer. *Id.* at 1–2. The Sixth Circuit already determined that Harden's argument is directly foreclosed by the Supreme Court's decision in *Warger v. Shauers*, 574 U.S. 40 (2014), which held that Rule 606(b) bars juror testimony based on the allegation that a juror lied during *voir dire*. *See Harden*, 993 F.3d at 478. Specifically, the Sixth Circuit held that "[b]ecause Harden's claim that one of the jurors lied during *voir dire* is based solely on juror testimony, . . . Rule 606(b) barred consideration of that testimony." *Id.* In any event, the purpose of the *Remmer* hearing was not to investigate Juror C.F.'s statements in *voir dir*e, but rather to investigate allegations of racial bias. Accordingly, the Court denies Harden's request to hold a hearing to further inquire into Juror C.F. or Hillman's counsel's statements regarding disclosure during *voir dire*.

It is unclear what Harden is asking of the Court in regards to the second issue in his Motion—Hillman's counsel's alleged misconduct. [R. 247, pp. 2–3]. In short, it appears Harden takes issue with Hillman's counsel "admitting to this Court that he also viewed Plaintiff's counsel's presentation of his case as comical." *Id*. at 3. There is no legal argument here, and the Court will not conduct a hearing to resolve this disagreement between counsel. Therefore, the Court denies Harden's Motion for Hearing.

In his Motion to Strike, Hillman argues that Harden's Motion for Hearing included improper legal arguments as to whether the juror testimony established racial bias, which the Court instructed the parties to address in simultaneously filed post-*Remmer* hearing briefs. [R. 250]. The Court agrees. Harden's examination of *United States v. Brooks* related solely to the issues of racial bias addressed at the *Remmer* hearing, not the independent issues raised in the Motion for Hearing. *See* [R. 247, pp. 4–5]. However, because Harden's argument addresses issues already resolved by the Sixth Circuit on appeal—whether the statements exhibited overt racial bias or mere offhand comments— and the

Court does not rely on these arguments in reaching its decision, Hillman's Motion to Strike is denied as moot.

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Plaintiff has demonstrated that racial bias prejudicially affected jury deliberations and is entitled to a new trial.

2. Plaintiff's Motion for Hearing, **[R. 247]**, is **DENIED**.

3. Defendant's Motion to Strike, **[R. 250]**, is **DENIED AS MOOT**.

4. The parties **SHALL** confer and provide three dates after October 1, 2022, when both parties are available to schedule a new trial.

This the 5th day of August, 2022.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

Claria Horn Boom

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY